**In the United States District Court**
**For the District of Maryland**

| | | |
|---|---|---|
| **United States of America** | * | |
| v. | * | No.  DKC-22-429 |
| **OJ Rashad Green** | * | |

\* \* \* \* \* \* \* \* \* \*

**Memorandum in Support of Request for Pretrial Release**

OJ Rashad Green, by and through undersigned counsel Assistant Federal Public Defender Ellie Marranzini, respectfully submits this memorandum in support of his request for pretrial release, to be heard by the Court on June 9, 2023.

Mr. Green has been charged with two counts of distribution of a controlled substance (fentanyl), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). ECF 1. The alleged offense conduct took place on January 21, 2022, and September 28, 2022. The indictment against him was filed on December 14, 2022.

Mr. Green was arrested and had his initial appearance on the indictment on January 4, 2023. ECF 6. At the time, he consented to detention "without prejudice to either side requesting a prompt hearing to set appropriate conditions of release or otherwise address the detention of the defendant." Order of Detention by Agreement, ECF 10. He has been held at the Chesapeake Detention Facility in Baltimore, Maryland since that time.

Mr. Green asks the Court to release him on conditions. His cousin, Latisha Battle, will be present in Court and has offered to serve as third-party custodian and can accommodate Mr. Green in her home. She has been screened by Pretrial Services.

## I.   Mr. Green Should Be Released on Bond with Conditions.

This Court should release Mr. Green with conditions. In this case, the statute creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). The presumption inquiry proceeds in two steps. At Step 1, this Court must consider whether the defense has met the very low burden of production to rebut the presumption. As set forth below, Mr. Green has presented evidence that rebuts the presumption. At Step 2, this Court must consider the presumption alongside all of the other § 3142(g) factors—even if the presumption has not been rebutted. Release is warranted in this case because there are numerous facts under § 3142(g) that both rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Mr. Green's appearance in court and the safety of the community.

## II.   The Statutory Presumption of Detention Should Be Viewed with Caution Because They Lead to High Rates of Detention for Low-Risk Defendants.

Congress enacted the statutory presumption of detention in the Bail Reform Act of 1984 (BRA) to detain "a small but identifiable group of particularly dangerous defendants."[1] Indeed, Congress intended the presumptions to operate primarily on "*major* drug traffickers."[2] Congress emphasized that detention should be presumed only for these major drug traffickers, essentially drug kingpins.[3] "Congress

---

[1] S. REP. NO. 98-225, at 6.
[2] S. REP. NO. 98-225, at 20 (emphasis added).
[3] S. REP. NO. 98-225, at 7 (emphasizing that it was only for this "limited group of offenders that the courts [needed the] . . . power to deny release pending trial").

considered at length arrestees' pretrial liberty interests, and concluded that the constitutional concerns with pretrial detention required a narrowly tailored statute to secure community safety and appearance in court."[4]

But the presumption of detention has not worked as intended, and federal pretrial detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in 2019.[5] A recent study by the Administrative Office of the Courts (AO) attributed this "massive increase"[6] in detention rates to the presumption of detention, especially as it is applied to low-risk defendants.[7] The study concludes that the statutory presumption in drug and firearm cases applies to *nearly half* of all federal cases and to 93% of drug cases.[8]

The AO study confirms that the presumption increases the detention rate without advancing community safety. Rather than jailing the worst of the worst, the presumption over-incarcerates the lowest-risk offenders in the system, people who

---

[4] Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 73 (2022), https://freedomdenied.law.uchicago.edu/ (citing S. REP. NO. 98-225, at 8–10).

[5] *Pretrial Release and Detention: The Bail Reform Act of 1984*, BUREAU OF JUST. STAT. SPECIAL REP., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); *Judicial Business: Federal Pretrial Services Tables*, ADMIN. OFF. U.S. COURTS ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019); *see also* AO Table H-14A (Sept. 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (61% detention rate *excluding immigration cases*).

[6] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 FED. PROB. 52, 61 (2017) (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[7] *Id.* at 57.

[8] *Id.* at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").

are stable, employed, educated, and have minimal to no criminal history.[9] When a low-risk individual is not facing a presumption, they're released 94% of the time.[10] Yet an identically low-risk individual in a presumption case is released just 68% of the time.[11] Recent testimony before Congress relied on this government study to call for reform: "These presumptions must be changed because they've had far-reaching and devastating consequences that were unforeseen and unintended by Congress."[12] Moreover, "[t]he BRA's legislative history demonstrates that Congress did not intend the drug presumption to apply so broadly," and only intended it to apply to "major drug traffickers," not people like Mr. Green.[13]

Relying on the groundbreaking findings of the AO study, the Judicial Conference's Committee on Criminal Law recently determined "that the § 3142(e) presumption was unnecessarily increasing detention rates of low-risk defendants, particularly in drug trafficking cases."[14] To address this problem, the Judicial

---

[9] *Id.* at 57.

[10] *Id.*

[11] *Id.*

[12] *See The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; *Testimony of Alison Siegler* at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-20191114.pdf; *see also Written Statement of Alison Siegler* at 13–17 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf (calling for the complete elimination of the presumptions in drug and gun cases).

[13] Erica Zunkel & Alison Siegler, *The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction*, 18 OHIO ST. J. CRIM. L. 283, 292 (2020) (analyzing legislative history of presumptions in detail).

[14] *Report of the Proceedings of the Judicial Conference of the United States* 10 (Sept. 12, 2017), archived at https://perma.cc/B7RG-5J78; *see also* Siegler, *supra* note 4, at 152 ("The Judicial Conference relied on a study finding that the presumption increased detention

Conference proposed significant legislative reform that would amend the presumption of detention in drug cases "to limit its application to defendants described therein whose criminal history suggests that they are at a higher risk of failing to appear or posing a danger to the community or another person."[15] In the wake of the Judicial Conference's recommendation, Judiciary Committee Chair Dick Durbin introduced a bipartisan bill in the Senate that would eliminate the presumption in all drug cases.[16]

This Court can take these developments into account when evaluating the presumption of detention in this case. Based on the proposed legislation, commentators have urged judges to give "little, if any, weight to the drug presumption of detention at the detention hearing stage."[17]

The problems with the statutory presumption of detention are important to Mr. Green's motion because, as the AO study confirms, high federal pretrial detention rates come with significant and wide-ranging "social and economic costs."[18] For example, the study explains that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a

---

orders by 26% for people in the lowest Pretrial Risk Assessment (PTRA) category. The same study found that detention rates in gun presumption cases climbed from 66% in 1995 to 86% in 2010.").

[15] *Judicial Conference*, *supra* note 14, at 10.

[16] Smarter Pretrial Detention for Drug Charges Act, S. 309, 117th Cong. (introduced Feb. 12, 2021).

[17] Zunkel & Siegler, *supra* note 13, at 289.

[18] Austin, *supra* note 6, at 61; *see also* Siegler, *supra* note 4, at 22 n.5, 61–72 (discussing the devastating consequences of high jailing rates on individuals, their families, their communities, and society, and citing studies in support).

defendant towards relapse and/or new criminal activity."[19] Indeed, the economic harms stemming from being detained pretrial persist for years: even three to four years after their Detention Hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[20] And the repercussions of pretrial detention overwhelmingly fall on poor people of color. Nationally, 81% of people charged with federal crimes are people of color.[21] In addition, "90% of defendants in federal court cannot afford to hire their own attorney," a clear indication that most people facing pretrial detention are poor.[22]

Data proves that pretrial detention does not make our communities safer or ensure appearance in court: "The harmful effects of pretrial detention cannot be justified as permissible consequences of protecting the community, since research shows that pretrial detention—for any amount of time—is correlated with an *increase* in recidivism."[23] The AO cites a famous study that found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[24]

---

[19] *Id.* at 53; *see also* Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) FED. PROB. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[20] Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AMER. ECON. REV. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[21] Siegler, *supra* note 4, at 24.

[22] *Id.*; *See* Ad Hoc Comm. to Review the Criminal Justice Act, 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act at xiv (2018), https://perma.cc/FM2Z-8GW3.

[23] Siegler, *supra* note 4, at 62 & n.102.

[24] Austin, *supra* note 6, at 54.

More recent studies have confirmed that pretrial detention is criminogenic[25] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[26] One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate.[27] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[28]

These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[29] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place. The presumption of

---

[25] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEGAL STUD. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[26] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & ECON. 529, 555 (2017).

[27] *See* Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, BUREAU OF JUST. STAT., at 9 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 J. SUBSTANCE ABUSE TREATMENT 239, 247, 249 (2007), archived at https://perma.cc/G55Z-4KQH.

[28] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 CRIME & DELINQUENCY 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[29] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) FED. PROB. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

detention also falls hardest on people of color, intensifying racial disparities in the federal system.[30] Conversely, releasing more people prior to trial does not correlate with increased rates of failure to appear or rearrest for new crimes.[31] In fact, the rates at which people on federal pretrial release either fail to appear in court or are rearrested for a new crime are extraordinarily low, "with both sitting at approximately 1–2%."[32] "Strikingly, rates of nonappearance and rearrest are just as low in the federal courts with the *highest* pretrial release rates as they are in the districts with the *lowest* release rates."[33]

There are also enormous fiscal costs associated with high federal pretrial detention rates. In 2021, it cost more than $35,000 to put a single person in jail for a year.[34] The FCJC study estimated that taxpayers spend "more than *one billion dollars* per year to pay for federal pretrial jailing."[35]

### III.   Case Law Emphasizes Two Checks That the BRA and the Constitution Impose on the Presumption of Detention.

Case law has established two checks that the BRA and the Constitution impose on the presumption: (1) there is an easy-to-meet standard for rebutting the

---

[30] Siegler, *supra* note 4, at 165–66 ("[M]ost arrestees facing a presumption are people of color, since they make up 75% of those convicted of qualify drug offenses nationwide. . . . Our data support the idea that the presumption may fall even more heavily on arrestees of color. . . . Of the cases in which prosecutors invoked the presumption during the Detention Hearing, 97% of the arrestees were people of color, and 3% were white."); Stephanie Holmes Didwania, *Discretion and Disparity in Federal Detention*, 115 Nw. U. L. Rev. 1261, 1265 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss5/1/ [https://perma.cc/3E3R-N4VN].

[31] Siegler, *supra* note 4, at 24.

[32] *Id.*

[33] *Id.* at 25 fig.4.

[34] *Id.* at 23.

[35] *Id.* (emphasis added).

presumption and the prosecution bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g).[36] In addition, it is impermissible to detain a defendant in a presumption case based solely on evidence of past dangerousness, the nature of the crime charged, or the weight of the evidence.

A.        **Step 1: The Presumption is Easily Rebutted.**

Very little is required for a defendant to rebut the presumption of detention. To rebut the presumption, a defendant simply needs to produce "some evidence that he will not flee or endanger the community if released." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986); *see also United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence.").

This "burden of production is not a heavy one to meet." *Dominguez*, 783 F.2d at 707; *see also United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at

---

[36] *Id.* at 151.

707 (emphasis added); *Jessup*, 757 F.2d at 384. Any "evidence of economic and social stability" can rebut the presumption. *Dominguez*, 783 F.2d at 707.

Notably, a defendant's ties to the community—standing alone—can rebut the presumption: "Where the defendant has presented considerable evidence of his longstanding ties to the locality in which he faces trial, as did [this defendant], the presumption contained in § 3142(e) has been rebutted." *United States v. Jackson*, 845 F.2d 1262, 1266 (5th Cir. 1988). As long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Dominguez*, 783 F.2d at 707 ("Any evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of one or both of the presumptions. . . . Once this burden of production is met, the presumption is 'rebutted.'" (quoting *Jessup*, 757 F.2d at 384)); *see also O'Brien*, 895 F.2d at 816 (finding presumption of flight risk rebutted by evidence of effectiveness of electronic monitoring ankle bracelet together with posting of defendant's home).[37] Importantly, the government bears the burden of *persuasion* at all times. *Dominguez*, 783 U.S. at 707; *Jessup*, 757 F.2d at 384; *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

---

[37] To rebut the presumption of flight risk, for example, a defendant does not "have to *prove* that he would not flee—*i.e.*, he would [not] have to *persuade* the judicial officer on the point. [Instead], he would only have to introduce a certain amount of evidence contrary to the presumed fact." *Jessup*, 757 F.2d at 380–81; *accord Dominguez*, 783 F.2d at 707.

**B.      Step 2: The Presumption Alone is Not Sufficient to Warrant Detention, and Must Be Weighed Along with the § 3142(g) Factors.**

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *See Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."); *Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

**C.      Forbidden Considerations in a Presumption Case**

A judge may not detain a defendant in a presumption case based solely on (1) an unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion—even if the presumption is unrebutted. It is not incumbent on the defendant to "persuade the judge that there exist conditions of release that will reasonably assure the safety of the community."[38] That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846–47 ("[T]he

---

[38] Siegler*, supra* note 4, at 156.

11

burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a defendant may not be detained "based on evidence that he has been a danger in the past[.]" *Dominguez*, 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can prove—by clear and convincing evidence—that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Id.* Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *Id.* at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Fourth, the weight of the evidence of guilt alone does not suffice to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.* This makes sense—a person's likelihood of guilt is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

IV.   **The Presumption of Detention Is Rebutted in This Case.**

Here, there is more than "some evidence that [Mr. Green] will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707. The defense has therefore rebutted the presumption in this case. Mr. Green has presented evidence that he has extensive and lengthy community and family ties. He was born and raised in the Washing, D.C. metropolitan area and his immediate and extended family live locally. Mr. Green's mother, five of his siblings, aunts, uncles, and cousins are long-term community residents who will be supportive of Mr. Green should he be released. Specifically, Mr. Green's cousin, Latisha Battle, is willing to serve as third-party custodian and has been screened by Pretrial Services.

The foregoing facts rebut the presumption of detention in this case.

V.   **Regardless of the Presumption, Mr. Green Must Be Released Because There are Conditions That Will Reasonably Assure Appearance and Safety.**

Regardless of whether this Court finds that the presumption of detention is rebutted, Mr. Green must be released because there are conditions that will reasonably assure the safety of the community and Mr. Green's appearance in court. The presumption of detention, on its own, is insufficient to justify detention. *Wilks*, 15 F.4th at 847 ("[A]n unrebutted presumption is not, by itself, an adequate reason to order detention."); *Jackson*, 845 F.2d at 1266 (concluding that if the presumption alone could justify detention, "there would be no need for Congress to have specified 'the weight of the evidence against the person' as a separate factor for the court to

consider"). The BRA requires courts to weigh all the § 3142(g) factors in every case, even when the presumption has not been rebutted. *Wilks*, 15 F.4th at 847.

A defendant cannot be detained "unless a finding is made that no release conditions 'will reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). Here, the government has not carried its high burden of proving by clear and convincing evidence that there are *no* release conditions that will reasonably assure the safety of the community. *See id.* at 708 n.8. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure Mr. Green's appearance in court. Thus, Mr. Green cannot be detained.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure Mr. Green's appearance in court and the safety of the community.

- Place Mr. Green in custody of third-party custodian "who agrees to assume supervision and to report any violation of a release condition to the court" [§ 3142(c)(1)(B)(i)]. Mr. Green's cousin, Latisha Battle, has offered to serve as third-party custodian and has been screened by pretrial services.
- Maintain or actively seek employment [(ii)]
- Maintain or commence an educational program [(iii)]
- Follow restrictions on "personal associations, place of abode, or travel" [(iv)]
  - Can include electronic monitoring, GPS monitoring, home detention, home incarceration.
- Avoid "all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense" [(v)]
- Report on a "regular basis" to PTS or some other agency [(vi)]
- Comply with a curfew [(vii)]
- Refrain from possessing "a firearm, destructive device, or other dangerous weapon" [(viii)]
- Refrain from "excessive use of alcohol" [(ix)]

14

- Refrain from "any use of a narcotic drug or other controlled substance . . . without a prescription" [(ix)]
- Undergo "medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency" [(x)]

Because there are conditions of release that will reasonably assure Mr. Green's appearance in court and the safety of the community, he should be released.

## VI. Statistics Showing that It Is Extraordinarily Rare for Defendants on Bond to Flee or Recidivate Further Demonstrate that the Foregoing Conditions of Release Will Reasonably Assure Appearance and Safety.

It is not necessary to detain Mr. Green to meet the primary goals of the BRA, which are to "reasonably assure" appearance in court and community safety. § 3142(e). In this case, this Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2021, 99% of released federal defendants nationwide appeared for court as required and 99% were not arrested for new crimes on bond.[39] Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[40] Even in districts

---

[39] App. 1, AO Table H-15 (Sept. 30, 2021). These high compliance rates have remained remarkably consistent over time, both before and after the pandemic. *See, e.g.*, Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide appearance rate of 99% and non-rearrest rate of 98%).

[40] The data showing near-perfect compliance on bond is illustrated in the figure below. Siegler, *supra* note 4, at 25 fig.4. The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending September 30, 2021. *See* App. 2, AO Table H-14A (Sept. 30, 2021), https://perma.cc/CYV5-3TZ6. The failure-to-appear and rearrest rates for these districts were calculated using App. 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 20.00%) have an average failure-to-appear rate of 1.6%, while the ten districts with the highest release rates (average 64%) have an *even lower* failure-to-appear rate of 1.1%. *See* App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 0.8%, while the ten districts with the highest release rates have an average rearrest rate of 1.1%. *See* App. 1; App. 2.

that release two-thirds of all federal defendants on bond, just 1% fail to appear in court and 1% are rearrested while released.[41] The below chart reflects the same vanishingly low failure to appear and rearrest rates based on AO data spanning 2007 to 2021.[42]



**Figure 4:** Even When Release Rates Increase, Arrestees Almost Never Flee or Recidivate.

In addition, as the federal Probation and Pretrial Services Office recently highlighted, release rates rose slightly during the pandemic but failure-to-appear and rearrest rates did not increase.[43] Release rates increased from 25% in 2019 to 36% in

---

[41] *See* App. 1; App. 2.
[42] *See* Siegler, *supra* note 4, at 25 fig.4.
[43] *Id.* at 246 n.42.

2021 but "the rates at which people on pretrial release failed to appear in court or were rearrested remained extremely low."[44]

The bond statistics for this district likewise strongly suggest that Mr. Green should be released. In this district, released federal defendants appeared for court 99.5% of the time in 2021, and only 1.7% of defendants were rearrested on release. *See* App. 1, AO Table H-15.

Mr. Green must be released because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court or are rearrested on bond.

## VII.   Conclusion

For these reasons, Mr. Green respectfully requests that this Court find that the presumption has been rebutted and release him with conditions.

Respectfully submitted,

James Wyda
Federal Public Defender

_____/s/_____
Ellie C. Marranzini, #817525
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: ellie_marranzini@fd.org

---

[44] *Id.*