In the United States District Court
For the District of Maryland

United States of America                    *

                    v.                      *          No.  DKC-22-429

OJ Rashad Green                             *

          *     *     *     *     *     *     *     *     *     *

Motion to Suppress Tangible and Derivative Evidence
And for a *Franks* Hearing

# Table of Contents

I.   **Factual Background** ................................................................................ 2

  A.  The Charles County Search Warrant ................................................ 2

    1.  The Affidavit's Articulation of Probable Cause Relied on ▮▮▮▮ and ▮▮▮▮ ▮▮▮▮'s Statements. ............................................................ 2

    2.  The Affidavit Relied on a Knowingly False Statement. ................. 3

  B.  The Federal Search Warrant ............................................................ 5

    1.  The Affidavit's Articulation of Probable Cause ......................... 5

    2.  Material Facts Known to Law Enforcement Were Omitted from the Affidavit. ...... 6

II.  **Argument** ......................................................................................... 13

  A.  Legal Standard and Procedures ...................................................... 13

  B.  Mr. Green Is Entitled to a *Franks* Hearing on the Charles County Warrant ............. 15

    1.  The Warrant Contained a False Statement that Was Made Knowingly, or At Least in Reckless Disregard for the Truth. ....................... 15

    2.  The False Statement Was Necessary to Probable Cause. ............... 16

  C.  The Federal Warrant Relied on the Fruits of the Charles County Warrant, Contained Additional Material Omissions, and Relied on Stale Information. ......................... 17

    1.  The Federal Warrant Relied on the Fruits of the Charles County Warrant. ......... 17

    2.  The Federal Warrant Contained Material Omissions. ................... 18

    3.  The Federal Warrant Relied on Stale Probable Cause. ............... 19

III.  **Conclusion** ....................................................................................... 20

## **Exhibits**

Exhibit A – Charles County Warrant and Affidavit

Exhibit B – Federal Residence Warrant and Affidavit

Exhibit C – ███████████████ Declaration

Exhibit D – ███████████ Declaration

Exhibit E – Maryland State Police Incident Report

Exhibit F – Transcript of ████████████ Interview on Feb. 16, 2022

Exhibit G – communications between -4203 and -9009

Exhibit H – Grand Jury transcript ████████████

Exhibit I – Proposed Order

OJ Rashad Green, by and through undersigned counsel, moves this Honorable Court to suppress the fruits of two search warrants: a February 18, 2022, Charles County Sheriff's Office search warrant for cell phone records ("the Charles County warrant")[1] and a December 29, 2022, federal search warrant for a residence ("the federal residence warrant").[2] Mr. Green seeks an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1988) to challenge the validity and constitutionality of both warrants.

The Charles County warrant was obtained largely on the basis of a false statement. This warrant sought cell phone records for a Verizon phone number ending in 9009 (that belonged to Mr. Green) in connection with an investigation into the fatal overdose of ███ ███ on February 14, 2022. The warrant affidavit falsely stated that a witness named ███ ███ told the affiant that he had purchased drugs from "a short black male with dreadlock style hair."[3] Exhibit A, Charles County Warrant at p 6. In fact, ███████ repeatedly told law enforcement that he purchased drugs from a white male. Exhibit C, ███████ Declaration. The false statement was necessary to probable cause; as a result, the warrant must be voided and its fruits suppressed.

The later federal warrant is deficient for three separate reasons. *First,* it relied on cell phone evidence derived from the unconstitutional Charles County warrant. *Second*, it omitted material information known to law enforcement, inclusion of which would have defeated probable cause. And *third*, it relied on an articulation of probable cause that—assuming *arguendo* it had ever been sufficient—was stale by the time of the application and execution.

The Court should hold a *Franks* hearing as to both warrants.

---

[1] Attached as Exhibit A.
[2] Attached as Exhibit B.
[3] Mr. Green is a Black man.

# I.    Factual Background

## A.  The Charles County Search Warrant

### 1.    The Affidavit's Articulation of Probable Cause Relied on █████ and ████████████'s Statements.

On February 18, 2022, Charles County Sheriff's Office Detective Cheyann Harris, who is also a DEA Task Force Officer, applied for and obtained a search warrant from a Charles County Circuit Court judge. Exhibit A. The warrant authorized the seizure of cell phone records, including geographic location data, between February 15, 2021, and February 15, 2022, for phone number █████-9009. That phone number was identified by a confidential informant as belonging to "Ice."

The affidavit in support of the search warrant asserted, in sum and substance, the following probable cause: In December of 2021, agents from the Drug Enforcement Administration (DEA) and Charles County Sheriff's Office (CCSO) began investigating "ICE", a suspected drug dealer in Accokeek, Maryland. Agents identified █████-9009 as Ice's phone number.

On February 14, 2022, CCSO learned of the suspected drug overdose of ███████████; CCSO Officer Watson responded to the scene. Exhibit A at p. 5. Officer Watson interviewed witnesses █████ and ████████████, who stated that they went with █████ to buy heroin from a drug dealer the night before. *Id.* at p. 6. That same day, Detective Harris also interviewed ████████. According to Detective Harris, ████████████ told her "that the drug dealer they bought from was located in Accokeek, Maryland" and "described him as a short black male with dreadlock style hair." *Id.* Detective Harris checked call detail records for Ice's number (█████-9009) and found that ████████████ had numerous contacts with him during January 2022. *Id.*

## 2. The Affidavit Relied on a Knowingly False Statement.

The defense investigation has uncovered evidence that the Charles County Warrant's representation of the ██████' statements to law enforcement was false.

On June 11, 2024, Federal Public Defender staff investigator Elizabeth Sandman met with ██████████. He informed her that on February 13, 2022, he, his brother (██████████), and ██████████ went to purchase heroin from Ice in Accokeek, Maryland. Ice is a Black man with dreads. Exhibit C, ██████████ Declaration. When they arrived at Ice's house, a white man came out of the house and said that he had heroin to sell them. He told them not to tell Ice that he had sold them the heroin because he did not want Ice to think he was selling to Ice's customers. They did not see Ice that day. ██████ spoke with law enforcement multiple times; each time he told them that while they had planned to buy drugs from Ice, they ended up buying drugs from a white man outside his house instead. *Id.*

On July 3, 2024, Ms. Sandman met with ██████████. As his brother had, he informed Ms. Sandman that on February 13, 2022, he, his brother ██████), and ██████ went to purchase heroin from Ice in Accokeek, Maryland. Ice is a Black man with dreads. Exhibit D, ██████████ Declaration. On the way to Ice's house, ██████ called Ice's phone multiple times; Ice did not answer. When they arrived, a white man came out of the house and sold them drugs. ██████ spoke with law enforcement and told them that while they planned to buy drugs from Ice, they ended up buying drugs from a white man. *Id.*

The ██████' statements to Ms. Sandman were consistent with ██████'s testimony before the Grand Jury on January 25, 2023.[4] Exhibit H. ██████ told the Grand Jury that they

---

[4] The defense received this Grand Jury transcript on September 26, 2024, pursuant to a supplemental discovery request.

had planned to buy drugs from Ice, but when they got there, Ice wasn't home and they "got something from another white guy." *Id.* at p. 8, l. 16-18.[5] He continued,

```
     A.     We rode up and one -- some white guy was there.
 And he was like hey, he's not here, he left.  So he's like,
 I'll take care of you.  And we met him down -- he met me
 down at the stop sign at the end of the street, I think
 Manning Road and the feeder road.
```
[6]

██████ clarified that others who sold drugs from or near Ice's house did not necessarily work with or for him. When asked whether "the other folks" he met with at Ice's house worked with Ice, ██████ responded,

```
     A.     Well I mean every time I went they always had
 different stuff than him.  So I know that 100 percent it
 wasn't the same stuff he had, so.
```
[7]

### B. The Federal Search Warrant

#### 1.    The Affidavit's Articulation of Probable Cause

On December 29, 2022, DEA Task Force Officer Timothy Mallicote applied for and obtained a federal search warrant for Mr. Green's residence in Accokeek, Maryland. Exhibit B. The affidavit in support of the warrant summarizes law enforcement's investigation into "Ice" beginning in December 2021. *Id.* at ¶ 14. In February 2022, law enforcement learned of

---

[5] Where the transcript says, "but he *went* home," counsel understands, based on context and familiarity with ██████'s accent, ██████ to have said "but he *wasn't* home."
[6] *Id.* at p. 10, l. 8-12.
[7] *Id.* at p. 13, l. 4-6.

the overdose death of Victim 1,[8] which had occurred on February 7, 2022, in Saint Leonard, Maryland. *Id.* at ¶ 17. Law enforcement learned from family members that Victim 1 had been with Witness 1[9] a few hours before his death; a law enforcement review of Victim 1's phone revealed text messages between Victim 1 (███████) and Witness 1 █████) discussing a drug transaction. *Id.* Law enforcement interviewed Witness 1 (█████), who stated he received fentanyl from Ice and then sold it to Victim 1 (█████). █████ gave █████-4203 as the number he had for Ice and identified a photograph of Mr. Green as Ice. *Id.* at ¶ 20. Law enforcement had previously obtained a search warrant for the historic geolocation data of Mr. Green's phone,[10] and the information supported █████'s account by showing that he and Mr. Green were geolocated together that day. *Id.* at ¶ 21.

The affidavit states that recorded controlled buys of fentanyl were conducted by a confidential source (CS2) from Mr. Green at his house on March 3, 2022; May 17, 2022; and September 28, 2022. *Id.* at ¶¶ 22, 28, 34. The affidavit asserts, generally, that law enforcement monitored Mr. Green's home by video surveillance between March and December of 2022. According to the affidavit, investigators observed a pattern of individuals entering the home for a few minutes and then exiting, including in December 2022. The affidavit states that investigators "believe[] these are fentanyl transactions based upon GREEN transaction pattern with CS2." *Id.* at ¶ 40.

---

[8] Victim 1 is █████████. This motion will refer to him as Victim 1 and █████ interchangeably.
[9] Witness 1 is █████████. This motion will refer to him interchangeably as Witness 1 and █████.
[10] This is the search warrant discussed above in Section A.

**2.** **Material Facts Known to Law Enforcement Were Omitted from the Affidavit.**

The affidavit did not recount every piece of evidence or fact known to law enforcement. Nor did it need to. But certain facts known to law enforcement yet omitted from the affidavit are significant.

**a.** ██████████ ██████s **Credibility Concerns, Varying Accounts, and Statements That Others Were to Blame.**

The affidavit omitted any mention facts undermining ██████'s credibility, including his arrest and exposure to criminal charges, his status as a cooperator/informant, the inconsistent statements he made to investigators, and his statements that others were to blame for ██████'s death.

██████ was arrested on February 16, 2022, after the execution of a search warrant at his home resulted in the seizure of controlled substances, a drug ledger, cash, and a cell phone. Exhibit E, MSP Incident Report at p. 2. That same day, ██████was interviewed by officers from the Maryland State Police and CCSO, including Detective Harris. He gave inconsistent accounts of what had occurred prior to ██████'s death. For example, he repeatedly told officers that he and ██████ went to get drugs from Ice together, and that ██████ did the drugs in the parking lot.

MR. ████ (Inaudible) he did get something
from Ice earlier, the guy that I get my stuff from. But
that was like 11 o'clock. But he only had $20. So he did
that in the car, like, on the way back. He did that when
I was with him.

MALE VOICE: Okay. Well, why didn't he go over
your house?

MR. ████: He stopped to drop me back off. We
went and met him and then he come back through dropping me
back off. But he had already done his, because he uses te
needles. He already did his stuff in the car, like on the
way home, before we even got back to the house.

*  *  *

MALE VOICE: And then you all went up the road
and met Ice?

MR. ████: Yeah, we met them. And then by the
time we got back out it was probably about 12:30. But
like I said, he had did his in the parking lot of Manokeek
at the little Manokeek parking lot right there in
Accokeek.

MALE VOICE: Um-hum.

MR. ████: Where the Giant and all that shit
is.

---

[11] Exhibit F, Transcript of Recorded Interview with ████ on February 16, 2022, at p. 28. This is a
defense-prepared transcript created by an external court reporting service from audio recordings produced in
discovery.
[12] *Id.* at p. 29.

* * *

MALE VOICE: Okay.  Did he use everything that he bought from Ice?

MR. ███: Everything.  I know that a hundred percent fact.  He was super sick when he come to see me.  Like puke and shit.  And he said all he had was $20 bucks,

that's all he had, was $20.  Because that guy, he don't even sells 20s.  I sold him like a little bit of a 20 out of what he was going to give me.  So he did everything right then.  And then he was fine.  But he left and he went home.  We went back to my house, dropped me off, we chilled for a little bit, smoked a couple of cigarettes, and then he left.

* * *

---

```
          MALE VOICE: So you're saying he drove over
there, picked you up?
          MR. ████: Yeah.
          MALE VOICE: And then you guys went.
          MR. ████: We went right there at the
Manokeek.
          MALE VOICE: Correct me if I'm wrong, but that's
not the story that we have.
```

After the interviewing agents confronted him with the inaccuracy of his account, ████ changed his story and said that ████ was dropped off at ████'s house by his grandfather, and consumed the drugs in ████'s basement:

---

MR. ▮▮▮▮: I'm telling you, I'm being honest with you (inaudible).

MALE VOICE: Because what we have is he was driven over there by somebody, met with you, and then they drove back to Calvert County.

FEMALE VOICE: At like 1:00 or 2:00.

MALE VOICE: This is what I'm saying, man.

MR. ▮▮▮▮: Okay, hold on. He did come with me one day, he did come over there like one day. Yeah, but still it was early though. I think it was still like around 11:00 or 12:00. He had has grandfather bring him over one time too.

MALE VOICE: Okay.

MR. ▮▮▮▮: But still, he did everything there. Like, he wouldn't take nothing back to that house with him, because his wife didn't know that he did it.

MALE VOICE: Okay.

MR. ▮▮▮▮: Neither did his grandfather.

FEMALE VOICE: What happened when the grandfather brought him over?

MR. ▮▮▮▮K: The day his grandfather brought him over, he had did his stuff in the basement. He did it before he left. And he didn't even, like, I think he only got like a 15 or a 20 that day, like, it was something like tiny. But he did it in the bathroom before he left



16

---

[16] *Id.* at p. 31

███ also repeatedly insisted that the drugs ███ had consumed at his house that day had not caused his death:

> MR. ████: No, he had his own needle and stuff
> with the stuff that he got. (Inaudible) some stuff that
> fucking that I had had from that guy, Ice. I swear, I
> didn't mean, like, I know you guys might think that I like
> did something. I didn't do nothing (inaudible)
> whatsoever. Like, I swear on my kids. I'll take a lie
> detector, I'll take anything. Like, I swear to God, like,
> he was fine when he left my place. (Inaudible) put that
> on everything.

[17]

███ repeatedly stated that ███ must have gotten a later supply of drugs from ███ and ██. *See id.* at pp. 27, 29, 30, 34, 35, 37.

> MR. ████ Like I said, I swear to you, honest
> to God, I don't think there's no way that it was the stuff
> that he got from me. There's no way possible. And like I
> said, the only other people that I know that have anything
> that they're selling that I feel like could hurt somebody
> is ███ and ██.

[18]

███ began cooperating against "Ice," and was released without charges. He continued to meet with law enforcement and offer information against Mr. Green.

---

[17] *Id.* at p. 32
[18] *Id.* at p. 34.

### b. Cell Phone Records Suggested the Number Identified by ▮▮▮ as Belonging to Ice Did Not Belong to Ice.

The affidavit notes that in February 2022 "law enforcement obtained a search and seizure warrant for the historic geolocation data from GREEN's phone, which supported Witness 1's account of the events on February 7, 2022, by showing that GREEN and Witness were geolocated together that day." Exhibit B, Affidavit at ¶21. The search and seizure warrant referred to is the February 18, 2022, Charles County warrant, discussed above and attached as Exhibit A. The records received by law enforcement pursuant to that warrant pertain to Mr. Green's phone number ▮▮▮-9009. ▮▮▮ gave law enforcement a different number, ▮▮▮-4203, as the number he had for Ice. Exhibit B at ¶ 18. Law enforcement did not reference any evidence suggesting that the number provided by ▮▮▮ (▮▮▮-4203) was geolocated with Mr. Green on the day in question. Agents looked at ▮▮▮'s phone and saw that the -4203 was saved in contacts under "▮▮▮."

At the time of the federal search warrant, law enforcement had the responsive records for the -9009 number from the Charles County warrant, which indicated that the -4203 number provided by ▮▮▮ did not in fact belong to Ice. The records showed 30 calls and 17 texts between the two numbers in early 2022. Additionally, the records revealed that on February 9, 2022, the user of -4203 texted -9009: "Heyyy bruh. It's ▮▮▮." Exhibit G.[19] The two numbers go on to converse through additional messages. It would make little sense for Ice to have called and texted his own phone number this many times, and less sense for him to refer to himself as "▮▮▮."

---

[19] These exhibits were created from records produced as Excel spreadsheets in discovery containing call detail records and SMS content.

All of this is to show that at the time of the federal search warrant, law enforcement had evidence that significantly cast doubt upon, if not disproved, the veracity of ███'s representation regarding his phone communications with Ice. And while agents relied piecemeal on these records to corroborate ████'s account, they entirely omit the aspects that undermined it.

## II. Argument

Both warrants are constitutionally flawed.

Detective Harris's affidavit relied on a false statement – that ███████ told law enforcement that he, his brother, and ███████ bought drugs from a short Black man with dreads. This false statement was knowingly made, or at least made with reckless disregard for the truth. Detective Harris spoke with ████████ herself. The representation that the ████ and ███████ obtained the drugs that caused ███████'s overdose from Ice was essential to the judge's finding of probable cause to search and seize cell phone records from the -9009 number. Mr. Green has made a substantial preliminary showing of these elements and is entitled to a *Franks* hearing.

In addition to relying in part on the fruits of the unconstitutional Charles County warrant, the federal warrant contained additional material omissions and relied on stale probable cause.

### A. Legal Standard and Procedures

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that "under limited and carefully circumscribed circumstances, a defendant may challenge an affidavit offered to procure a search warrant against a defendant." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). The Court held:

> [W]here the defendant makes a substantial preliminary showing
> that a false statement knowingly and intentionally, or with
> reckless disregard for the truth, was included by the affiant in the
> warrant affidavit, and if the allegedly false statement is necessary
> to the finding of probable cause, the Fourth Amendment requires
> that a hearing be held at the defendant's request. In the event that
> at that hearing the allegation of perjury or reckless disregard is
> established by the defendant by a preponderance of the evidence,
> and, with the affidavit's false material set to one side, the
> affidavit's remaining content is insufficient to establish probable
> cause, the search warrant must be voided and the fruits of the
> search excluded to the same extent as if probable cause was
> lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155-56. The Fourth Circuit has also held that a defendant may challenge

a search warrant where "affiants omit[ted] material facts with the intent to make, or in reckless

disregard of whether they thereby made, the affidavit misleading." *United States v. Colkley*, 899

F.2d 297, 300 (4th Cir. 1990). To be entitled to a *Franks* hearing on this ground, a defendant

must make "a substantial preliminary showing" that the affiant "omitted material facts that

when included would defeat a probable cause showing." *Tate*, 524 F.3d at 455.

The requisite preliminary showing is a "dual showing . . . which incorporates both a

subjective and objective threshold component." *Id*. Initially, the defendant must show the

affiant made the "false statement [or material omission] knowingly and intentionally, or with

reckless disregard for the truth." *Id*. Where the allegations rest on material omissions, the

defendant must show that the affiant "omitted information with the intent to mislead the

magistrate or that he omitted the information with reckless disregard of whether it would

make the affidavit misleading." *United States v. Lull*, 824 F.3d 109, 115-16 (4th Cir. 2016).

Though "a showing that the officer acted negligently . . . is insufficient to warrant

suppression," the court may infer recklessness or intent from the affiant's knowledge of the

omitted facts and the circumstances surrounding the decision to exclude the information. *See id.* at 115-17.

Next, the defendant must show that the false statements or material omissions would have been necessary to the finding of probable cause. *Franks*, 438 U.S. at 156; *Colkley*, 899 F.2d at 300. This standard is met where, absent the false information and/or material omissions, the remaining content of the search warrant affidavit would not furnish sufficient probable cause to search the specified locations. *Colkley*, 899 F.2d at 300. To meet the "substantial preliminary showing," a defendant must make a detailed "offer of proof." *Tate*, 524 F.3d at 455 (internal citations omitted). If the defendant makes the requisite showing, "the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56.

### B. Mr. Green Is Entitled to a *Franks* Hearing on the Charles County Warrant.

#### 1. The Warrant Contained a False Statement that Was Made Knowingly, or At Least in Reckless Disregard for the Truth.

As it pertains to the Charles County warrant, Mr. Green's motion is straightforward – the warrant relied on a false statement. Detective Harris's affidavit claims that ███████████ told her that they bought from a drug dealer in Accokeek and that ██████ described him as "a short black male with dreadlock style hair." Exhibit A at p. 6. The affidavit states that ████████████ made "numerous contacts with 'Ice,' the described drug dealer in Accokeek, Maryland." *Id.* In other words, the affidavit claims that the ██████ identified Ice as the drug dealer from whom they purchased drugs prior to ██████s death.

As explained above, both ██████ and ████████████ attest that they did *not* tell law enforcement that they bought drugs from Ice on the night in question. Rather, they told law enforcement, multiple times, that they planned to buy drugs from Ice, but ended up buying

drugs from a white man instead. This account is corroborated by ████████'s later testimony before the Grand Jury, and by cell phone records law enforcement had at the time of the warrant application.

The statement in the affidavit was plainly false and it was knowingly made. As Detective Harris was both the affiant and the person who spoke to ████████ about who they bought drugs from, she cannot claim that she misunderstood or misstated information provided to her from another officer.

## 2. The False Statement Was Necessary to Probable Cause.

The false statement was necessary to the finding of probable cause because it served as the essential link between the overdose death investigation and Mr. Green's phone.

The warrant sought Mr. Green's phone records in connection with an investigation into the overdose death of ██████. The only connection between ██████'s death and Mr. Green's phone was the one purportedly made by the ██████; they described buying drugs from a dealer in Accokeek; the dealer was described as a short Black man with dreadlock hair; ████████ had made numerous contacts with "Ice," "the described drug dealer in Accokeek" (for whom a different confidential informant had provided the -9009 phone number) during January 2022. Exhibit A at p. 6.

Excised of the false statement, the affidavit lacks probable cause for the search and seizure of Mr. Green's cell phone records. The false statement is the only nexus between the crime being investigated and the place to be searched. Accordingly, the warrant must be voided and its fruits suppressed.

### C. The Federal Warrant Relied on the Fruits of the Charles County Warrant, Contained Additional Material Omissions, and Relied on Stale Information.

The federal warrant suffers from three constitutional defects. *First,* it relied on cell phone evidence derived from the unconstitutional Charles County warrant. *Second*, it omitted material information known to law enforcement. And *third*, it relied on an articulation of probable cause that—assuming *arguendo* it had ever been sufficient—was stale. Once the illegally obtained information is excised from the affidavit, and the improperly omitted information is added, the affidavit lacks probable cause.

#### 1. The Federal Warrant Relied on the Fruits of the Charles County Warrant.

The federal warrant relied in significant part on ████'s statements implicating Mr. Green in the sale of the drugs that caused ████'s death. Exhibit B at ¶¶ 17-21. The affidavit referenced the historic geolocation data, obtained from the Charles County warrant, as corroboration of ████'s account. *Id.* at ¶ 21. Because the evidence from the Charles County warrant was illegally obtained, it must be stricken from the affidavit, and the remaining content assessed for probable cause. *See United States v. Karo*, 468 U.S. 705, 719 (1984) (information obtained in violation of Fourth Amendment would invalidate search warrant if it proved critical to establishing probable cause); *United States v. Tate*, 524 F.3d 449, 457 (4th Cir. 2008) (striking facts derived from illegal search from search warrant affidavit); *United States v. Gillenwaters*, 890 F.2d 679, 681-82 (4th Cir. 1989) (information illegally obtained must be excised from warrant affidavit). What is left on this topic, then, is ████'s account uncorroborated by any cell phone records.

## 2. The Federal Warrant Contained Material Omissions.

Two categories of material facts, known to law enforcement, were omitted from the affidavit with the intent to make, or in reckless disregard of whether they made, the affidavit misleading. *First*, the affidavit omitted information adverse to █████'s credibility, while relying heavily on his statements. *Second,* the affidavit omitted that cell phone records suggested the number █████ said belonged to Ice did not belong to Ice. In light of the information to be excised, articulated above, had these material facts been included, they would have defeated probable cause.

Omissions that "prevent a neutral magistrate from being able to accurately assess the reliability and the veracity, and thus the significance, of the informant's statements" are material for *Franks* purposes. *See Lull*, 824 F.3d at 118 (suppressing evidence where affiant omitted fact that confidential informant stole money from police); *see also United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019) (remanding for a *Franks* hearing because the warrant application depended "heavily" on the credibility of a witness and the affiant omitted "substantial adverse information" about the witness's credibility); *United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014) (concluding that an affidavit that "omitted all information regarding the informant's credibility . . . undermined the issuing magistrate's ability to perform his role as a neutral arbiter of probable cause").

By failing to include any information regarding █████'s credibility issues—including his arrest and exposure to criminal charges related to drug distribution and █████'s overdose, his status as a cooperator or informant, the inconsistent and untruthful statements he made to investigators, or his statements that others were to blame for █████'s death— the affidavit prevented the magistrate from conducting *any* assessment of his veracity, and

misled the magistrate into giving significant weight to his statements. What is more, at the time of the affidavit, law enforcement had evidence that cast doubt upon, *if not disproved entirely*, ███████'s statements regarding his phone communications with Ice. This information not only meaningfully undermines ███████'s credibility but also points to a different culprit, and is therefore exculpatory. The agent not only hampered the magistrate's ability to assess ███████'s veracity, but affirmatively mislead the magistrate by relying on the same records to *corroborate* ███████'s account.

### 3. The Federal Warrant Relied on Stale Probable Cause.

The federal warrant affidavit, submitted in the final days of December 2022, relied on transactions that allegedly took place between February and September, 2022.

"[T]ime is a crucial element of probable cause. A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (internal quotations and citation omitted). Evidence seized from a warrant based on stale probable cause is inadmissible. *Id.* at 1336.

Here, the warrant fails to establish that evidence of drug distribution would be found in the home months after the last controlled purchase. In an attempt to avoid staleness, the affidavit's concluding paragraph generally alleges that interactions investigators "believe[] are fentanyl transaction[s]" took place "up to and including December 2022." Exhibit B at ¶ 40. This generalization does little to justify probable cause at the time of the warrant application. The affiant's beliefs or conclusions, wholly unsupported by facts, do not contribute to probable cause. *See United States v. Cervantes*, 703 F.3d 1135, 1149 (9th Cir. 2012) (affording little if any weight to detective's conclusory statement that based on his training and

experience the box in defendant's possession came from a suspected drug stash house). And no corroborative evidence of agents' claim to have conducted surveillance through December 2022 has thus far been produced in discovery. The evidence sought by the warrant—drugs, money, communications, clothing, *see* Exhibit B Attachment B—was of the kind that is ordinarily moved or destroyed within a short amount of time, and therefore could only be seized upon timely probable cause.

In sum, after September 2022, agents lacked concrete reason to believe evidence of the target offenses would be found in the home. The warrant was based on stale probable cause, and the evidence seized pursuant to it must be suppressed.

* * *

Once the federal affidavit is excised of unconstitutionally obtained information, and supplemented with improperly omitted information, it lacks probable cause. It must be voided and its fruits suppressed.

## III.    Conclusion

Mr. Green has made a substantial preliminary showing that he is entitled to a *Franks* hearing as to both the Charles County and the federal warrant.

A proposed order is attached.

Respectfully submitted,

James Wyda
Federal Public Defender

_____/s/_____
Ellie C. Marranzini, #817525
Douglas R. Miller, #18309
Assistant Federal Public Defenders
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: ellie_marranzini@fd.org
douglas_miller@fd.org