## In the United States District Court
## For the District of Maryland

United States of America                          *

           v.                                    *          No.  DKC-22-429

OJ Rashad Green                                   *

       *   *   *   *   *   *   *   *   *   *

### Motion to Dismiss Count One of Superseding Indictment

# Table of Contents

I. Factual Background ........................................................................................................ 2

   A.  The government investigates the death of ███████████ and develops ████████ ████ as a suspect. ........................................................................................................ 2

   B.  The government searches ██████████████ house and seizes his LG TracFone, a "drug ledger," and prescription bottles, among other items. ...................................... 3

   C.  The government interviews ████████████ whose statements put the government reasonably on notice that the cell phone, "drug ledger", and prescription bottles will be material to the investigation and to Mr. Green's defense. ███████████ begins cooperating with the government and testifies before the grand jury in this case. ................................................ 3

   D.  The government indicts Mr. Green for "controlled buy" drug distributions conducted as part of the same investigation as █████████ death. ............................................. 6

   E.  The government obtains records which contradict the claim that the -4203 number belonged to Mr. Green. ........................................................................................................ 7

   F.  The government destroys ████████████ LG TracFone and "drug ledger," and appears to have destroyed the prescription bottles. ................................................................ 8

   G.  The government obtains a Superseding Indictment charging Mr. Green for drug distribution resulting in ████████ death. ............................................................. 13

   H.  The government intends to use cell site location information—which is less accurate than the GPS data likely destroyed along with the LG TracFone—to place the LG TracFone in proximity to Mr. Green's cell phone at the time of the alleged drug distribution. ................... 13

   I.  Additional data on the destroyed LG TracFone was material to Mr. Green's defense and would likely contradict ████████ account or be otherwise exculpatory to Mr. Green. ....... 15

II. Argument ...................................................................................................................... 16

   A.  The Court Should Dismiss Count One .................................................................. 17

      1.  The Fifth Amendment Due Process Clause entitles a Defendant to "all evidence which tends to exculpate him of guilt," including evidence which "tends to impeach the credibility of a key witness for the prosecution." ........................................................................ 17

      2.  Government spoliation of evidence is a due process violation where the evidence had an apparent exculpatory value at the time of destruction and the defendant would be unable to obtain comparable evidence by reasonably available means. If the content of the evidence is unknown, an additional requirement of bad faith may apply. ............................................... 18

      3.  The destroyed items had exculpatory value that was apparent at the time of their destruction and Mr. Green is unable to obtain comparable evidence by reasonably available means. ........................................................................................................................... 19

      4.  No bad faith requirement should apply, but even if it does, the government acted in bad faith when it destroyed this evidence. ................................................................................. 23

    5.    The Court's Due Process Protections Act Order provides a separate and independent basis for dismissal.................................................................................................... 26

B.   In the alternative, the Court should exclude the testimony of ███████ and the cell site location information from the LG TracFone's -7754 telephone line. ...................................... 26

C.   Mr. Green is entitled to an evidentiary hearing. ............................................................... 28

III.   Conclusion ..................................................................................................................... 28

OJ Rashad Green, by and through undersigned counsel, moves this Honorable Court to dismiss Count One of the Superseding Indictment (ECF No. 51). The government destroyed key evidence whose exculpatory value was apparent at the time of its destruction, and without which Mr. Green cannot fairly be tried on Count One consistent with his Fifth Amendment right to due process. Mr. Green cannot obtain this evidence from any other source.

The destroyed evidence all relates to the government's central witness, ███████ ███████ allegedly the direct distributor of the drugs which led to the fatal overdose in this case. The government destroyed ███████ LG TracFone cell phone, together with all the data it contained, without making a forensic image. As discussed more fully below, this device likely contained GPS location data which Mr. Green could have used to rebut the (less accurate) cell site location data which the government intends to introduce against him.

The device also likely contained the content of text messages between ███████ and a cell phone number which ███████ claimed belonged to his drug supplier "Ice" (allegedly Mr. Green). Extrinsic evidence strongly suggests that ███████ was untruthful in this claim, and the text message contents would confirm and expand that conclusion. Other text messages and data stored on the phone would potentially have established alternative sources of supply for the drugs sold by ███████ as well as provided additional impeachment material for this linchpin witness.

The government also destroyed a "drug ledger" seized from ███████ which had the obvious potential to exonerate Mr. Green because it might have contained records of ███████ purchasing drugs from other individuals in the period leading up to ███████ death. And it destroyed prescription bottles which ███████ claimed that "Ice" had handled two days prior to their seizure, despite the obvious potential that the absence of Mr. Green's fingerprints and DNA, or the presence of another person's fingerprints or DNA, would be exculpatory.

1

At the time it destroyed this evidence, the government was well aware of ███████ status as the likely central witness in a distribution-resulting-in-death prosecution which had been the subject of investigation for years, and in which Mr. Green had already been federally indicted for controlled distributions. The officer who destroyed the evidence was directly on notice that ███ ███ would be testifying in a federal case against the alleged supplier of his drugs, and that this evidence could be needed in that case. While no bad-faith requirement should apply to this Motion, the government's actions fully satisfy that requirement.

The Court should dismiss Count One, but if it does not, it should prohibit the government from introducing the cell site location information from the destroyed LG TracFone, and from calling ███████ as a witness. Mr. Green is entitled to a hearing on this motion.

## I.    Factual Background

### A. The government investigates the death of ███████ and develops ███████ as a suspect.

On February 7, 2022, ███████ died of a suspected drug overdose. Maryland State Police (MSP) were the initial responders and investigators.[1] MSP developed ███████ as a suspect for the source of the involved drugs and obtained a search warrant for his residence on ███████ in Waldorf. *Id.* By no later than the February 16 execution of this search warrant, DEA Task Force Officer (TFO) and Charles County Sherriff's Office (CCSO) Detective Cheyann Harris had taken at least a co-equal role in the investigation.[2]

---

[1] *See* Exhibit 1, Affidavit of MSP TFC Brandy Robinson (Feb 17, 2022) (submitted in support of search warrant application for Verizon records relating to telephone number -7754), at 6.
[2] *See* Exhibit 2, Affidavit of TFO Cheyann Harris (July 18, 2022) (submitted in support of an application for a search warrant for Verizon records relating to telephone number ███████-4203), at 6

**B. The government searches ████████████████ house and seizes his LG TracFone, a "drug ledger," and prescription bottles, among other items.**

On February 16, 2024, MSP executed the search warrant at the ███████ house and arrested ██████████████ on an outstanding warrant.[3] In addition to multiple suspected oxycodone and other pills, suspected marijuana, currency, and other items, MSP seized the following items of relevance to this Motion:

- A Black LG TracFone Smartphone identified as ███████████████ phone, with telephone number ██████-7754, serial number ZNFL322DL; and International Mobile Equipment Identifier (IMEI) 356058106116781.[4]

- A "drug ledger."[5]

- Prescription pill bottles, some unlabeled and some labeled with the name of another individual.[6]

According to an August 19, 2024 letter from MSP Detective Sergeant James Barth to Assistant United States Attorney Darren Gardner, attached as Exhibit 4, both the LG TracFone and the "drug ledger" were "dropped in MSP La Plata evidence by Cpl. K. Morris" on February 17, 2022.[7] The prescription bottles are not mentioned separately from the seized pills, but assuming that they were kept together with the pills, the latter were "sent to MSP crime lab" on March 1, 2022 and "returned to La Plata Barrack" on March 28, 2022.[8]

**C. The government interviews ███████████████ whose statements put the government reasonably on notice that the cell phone, "drug ledger", and prescription bottles will be material to the investigation and to Mr. Green's**

---

[3] Exhibit 3, MSP Incident Report (Feb. 16, 2022) with attachments, at 2.
[4] *Id.*
[5] *Id.*
[6] *Id.* at 6, 9, 13. The number of bottles seized and how many are labeled and unlabeled is described inconsistently in different parts of the exhibit.
[7] *Ex.* 4 at 2.
[8] *Id.* at 1.

defense. ████████ **begins cooperating with the government and testifies before the grand jury in this case.**

On the same day that MSP searched the ████████ house and arrested ████████, ████████ was interviewed by MSP Detectives Robinson and Morris and by DEA Task Force Officer / CCSO Detective Harris.

████████ made a number of inconsistent statements in the interview, some of which are addressed in Mr. Green's separately filed *Franks* motion. What is relevant for the instant Motion is that ████████ identified his principal drug supplier as "Ice," whom the government alleges to be Mr. Green.[9] He described obtaining pills, "dope," and powder and crack cocaine from "Ice," often "fronted" (i.e. provided for sale on consignment).[10] He stated that all the drugs seized that morning from his house, with the exception of the pill bottles labeled in another individual's name, had come from "Ice."[11]

Although ████████ repeatedly insisted that the drugs he supplied to ████████ could not have been the cause of his death,[12] on information and belief it is the government's theory that ████████ fatally overdosed on drugs supplied by Mr. Green to ████████ and then by ████████ to ████████

████████ stated that "Ice" frequently changes phone numbers, but that his current phone number would be saved in ████████ phone as "██."[13] Detective Harris reviewed ████████ contacts in the LG TracFone and found that the number for "████████" was ████-4203.[14]

---

[9] Exhibit 5, Transcript of February 16, 2022 Interview of ████████ at 10.
[10] *Id.* at 11, 12, 14, 16, 17.
[11] *Id.* at 11, 13
[12] ████████ insistence on this point, and the reasons he articulated for that belief—including identifying the individuals from whom he believed it likely that ████████ had obtained additional drugs later in the day—is also addressed in the *Franks* motion.
[13] *Id.* at 19.
[14] Ex. 2 at 6; Exhibit 6 (photograph of LG TracFone showing contact for "████████.")

████████ acknowledged that his own cell phone number was ██████-7754 (the number assigned to the LG TracFone) and that this was the number he used to call and text with "Ice."[15]

████████ made numerous statements that, if taken as true, reasonably put the government on notice there would have been multiple contacts between his phone and "Ice's" phone:

- That he has known "Ice" for between 6 months and one year;[16]

- That he communicates with "Ice" normally via text, sometimes by phone call, never on WhatsApp or other apps, but that "Ice" "don't say nothing" (presumably about drugs) in these texts or calls;[17]

- That he and "Ice" normally meet "out" (i.e. not at each other's homes), and most commonly at a Weis grocery store in Accokeek;[18]

- That when "Ice" got a new supply of drugs in, he would text ████████ to alert him to this fact.[19]

Most or all of the above statements, if taken as true, reasonably put the government on notice that the content of the "drug ledger" would be material to the investigation and relevant to "Ice's" defense.

████████ also made the following statements that, if taken as true, reasonably put the government on notice that the presence or absence of fingerprint or DNA evidence on the unlabeled prescription bottles would be material to the investigation and relevant to Ice's defense:

- That "Ice" provides the pills in bottles, which he rips the labels off of by hand and has done this in front of ████████[20]

---

[15] Ex. 5 at 43.
[16] *Id.* at 21.
[17] *Id.* at 21, 43.
[18] *Id.* at 15. It is a reasonable inference that such meetings were arranged in advance.
[19] *Id.* at 50-51.
[20] *Id.* at 15

- That on "the day before yesterday," "Ice" had handed ███████ a prescription bottle with the label on it, then "instantly grabbed it back" and tore the label off.[21]

On July 25, 2023, Sgt. Patrick Lane of MSP told MSP Detective Sergeant James Barth in an email that:

> the federal suspect who is awaiting trial is the one who sold these [drug evidence] items to ██████████ and ██████ *has agreed to testify against this party*, so its very possible the prosecutor will want these. This is part of a *federal cooperation agreement between the prosecutor and* ██████████[22]

(Emphasis added.)

██████████ precise relationship with the government is uncertain. In response to discovery requests for "Any cooperation agreement, proffer letter, or immunity offer extended to and/or accepted by ██████████ with relation to this case, or confirmation that none exists" and "██████████ informant file, or confirmation that none exists," counsel for the government responded "none exists" to both items.

However, ██████████ was interviewed again by the government an unknown number of times—at least once more that was audio recorded on April 20, 2022 by TFO Harris and MSP Detective Robinson. ██████████ later testified before the Grand Jury in this case on January 25, 2023.

### D. The government indicts Mr. Green for "controlled buy" drug distributions conducted as part of the same investigation as ██████████ death.

On December 14, 2022, the government obtained a federal Indictment (ECF No. 1) charging Mr. Green with two alleged distributions of fentanyl, one on January 21, 2022 and one on September 28, 2022. While Mr. Green was not charged at that time with distribution resulting

---

[21] *Id.* 17-18
[22] Exhibit 7, Email Chain Between MSP Det. Sgt. James Barth and MSP Personnel, at 3. *See also* Ex. 4 at 2.

in the death of ▮▮▮▮▮▮▮ it is clear that at least the September 28 distribution was a "controlled buy" conducted as part of the same investigation.[23]

Mr. Green's initial appearance occurred on January 4, 2023. ECF No. 6. The same day, United States Magistrate Judge Timothy J. Sullivan issued an order pursuant to the Due Process Protections Act, Pub. L. No 116-182, 134 Stat. 894, and Fed. R. Crim. P. (5)(f), ordering the government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and stating that "not doing so may result in the impositions of the sanctions referenced in this Order." Among the sanctions listed were "dismissal of charges" and "exclusion of evidence." ECF No. 9.

On February 2, 2023, defense counsel transmitted to the government a discovery demand letter, attached as Exhibit 9 which included a request for "[a]ll books, papers, documents, data, photographs, or tangible objects, or copies or portions thereof, that are material to Mr. Green's defense. *See* Fed. R. Crim. P. 16(a)(1)(E)(i)." The letter further requested "*Brady* material" to include "all documents and information (in whatever form) that are favorable to the defense or that would tend to exculpate Mr. Green with respect to the charges in the Indictment or that are relevant to the issue of sentencing."[24]

### E. The government obtains records which contradict the claim that the -4203 number belonged to Mr. Green.

In early 2022, the government obtained records for the telephone number ▮▮▮▮-9009, which at least one confidential informant had identified as belonging to Mr. Green.[25]

---

[23] *See* Exhibit 8, Affidavit of DEA TFO Timothy Mallicote (Dec. 29, 2022) (submitted in support of search warrant application for ▮▮▮▮▮▮▮▮▮▮), at ¶¶ 19-20 & 34-39. Moreover, counsel for the government disclosed to undersigned counsel at the outset of the case that the government intended to obtain a superseding indictment in connection with the death of ▮▮▮▮▮ and/or a second alleged overdose death.

[24] Ex. 9 at 1, 3.

[25] The records are referenced in Det. Harris's July 18, 2022 Affidavit for records for the -4203 telephone line, Ex. 2 at 4. Verizon certifications produced in discovery indicate that the -9009 records were produced in two tranches, on January 18, 2022, and February 22, 2022.

These records show that the -4203 number which ████████ claimed belonged to "Ice" exchanged 30 voice calls and 17 texts with Mr. Green's known ████-9009 number between January 14, 2022 and February 15, 2022.[26] Because it is implausible that a person would call and text his own phone number that many times, this pattern is much more consistent with the -4203 number belonging to a person known to Mr. Green than with that number belonging to Mr. Green himself.

They also show that on February 9, 2022, the user of the -4203 number texted Mr. Green's -9009 number: "Heyyy bruh. It's ████."[27] The two numbers go on to converse through additional messages. Once again, it is implausible that Mr. Green would engage in a back-and-forth text conversation with himself, while referring to himself as "████." It is much more likely that the -4203 number belonged to an individual known to Mr. Green, rather than belonging to Mr. Green himself.

### F. The government destroys ████████████ LG TracFone and "drug ledger," and appears to have destroyed the prescription bottles.

On January 16, 2023, Det. Sgt. Barth emailed MSP personnel in the CED Central South Division "Please advise on the following Open CDS Cases for property disposition. Both are for the same suspect," and listed:[28]



████-MSP-████
Robinson #5797
Suspect: ████████
CDS from search warrant, numerous pills
Non PH Items: Drug Ledger, LG Smart Phone & counterfeit $100 bill[29]

---

[26] *See* Exhibit 10 at 2-3. Exhibit 10 is a summary exhibit created by the defense from voluminous carrier-provided records obtained via search warrant and produced in discovery; the government is in possession of the full records.
[27] *Id*. at 1.
[28] The other case was an earlier trash pull from ████ and included only drug evidence.
[29] Ex. 7 at 1; Ex. 4 at 2.

By this time, the LG TracFone and "drug ledger" had been at the MSP LaPlata Barracks for 11 months and the prescription bottles for about 9½ months. Also by this time, Mr. Green had been federally indicted and had his initial appearance. Sergeant Patrick Lane responded "regarding the CDS for the ███████████ cases, we need these. We believe a suspect involved in this fatal overdose will be indicted federally."[30]

Six months later on July 19, 2023, Barth reached out to Lane again: "Any Update on the Fed's needing this CDS for the case," to which Lane replied "i'll find out and let you know." Barth reached out again on July 25 and asked "Is there any update to these two CED CDS cases? If the suspect is going to be charged in Federal Court, I would like to turn the evidence (CDS) over to them or can it be destroyed." After some back and forth, Lane responded (as quoted earlier in this motion), that:

> the federal suspect who is awaiting trial is the one who sold these items to ██████ and ██████ has agreed to testify against this party, so its very possible the prosecutor will want these. This is part of a federal cooperation agreement between the prosecutor and ████████[31]

Barth heard nothing further from Lane, and reached out again on October 11 and October 25, 2023 to both Lane and Corporal Kyle Morris. In the latter email, Barth noted to Lane and Morris that "In addition to the 2 CDS cases there is *a cell phone, drug ledger* and counterfeit $100 bill in property."[32] (Emphasis added.)

That same day, Cpl. Morris responded:

> Good afternoon D/Sgt. This case is wrapping up in federal court. We just enter the last bit of evidence requested by the defense. Long and short the evidence can be destroyed following the outcome of the

---

[30] Ex. 7 at 1; Ex. 4 at 2.
[31] Ex. 7 at 3; Ex. 4 at 2.
[32] Ex. 7 at 4; Ex. 4 at 2

case, which I'm hopeful will be in the next few weeks. I will let you know as soon as the court proceedings are done.[33]

On December 4, 2023, Barth wrote to Patrick, Morris, and Det. Sgt. Wesley Jefferson "checking in on this," but never received a response.[34] He then proceeded to personally destroy the "non-value items" (i.e. including the LG TracFone and the "drug ledger") on December 6, 2023, and sent the "property record items" (i.e. including the pills and presumably the pill bottles) to the MSP crime lab on December 19, 2023 for destruction there.[35] The destruction of the LG TracFone and "drug ledger" is also reflected on Exhibit 11 (Chain of Custody Log), although this document indicates that they were destroyed on December 7.

Six months later, on June 14, TFO Harris emailed Sgt. James Cooper of MSP's Digital Forensics Laboratory stating:

> Following up with our conversation on the phone today, I am looking for the digital extraction from a cellular phone recovered during a search warrant on the residence of ███████ on 02/16/2022. The search warrant took place at ████████████, Waldorf, MD. The search warrant was a follow up investigation into the overdose death of ███████████ report number 22-MSP-004933. This case was picked up by the DEA when I was a task force officer with them (file number GD-18-0008) and the ultimate supplier is being charged with ███████ death. Could you please help me track down the digital extraction for ██████ cellular phone recovered during the search warrant, as well as those reports pertaining to the search warrant, phone recovery, and extraction.[36]

Sgt. Cooper replied that he could not "seem to find any cases relative to this investigation," but that "one possibility is that they had a local sheriff's office or taskforce extract the phone and not us." TFO Harris replied in relevant part that:

> We, DEA, did not take the phone or any of the evidence from the search warrant. Kyle Morris was one of the MSP detectives involved

---

[33] Ex. 7 at 5; Ex. 4 at 2
[34] Ex. 7 at 5; Ex. 4 at 2.
[35] Ex. 4 at 2-3.
[36] Exhibit 12, Email Chain Among TFO C. Harris, Sgt. J. Cooper, and Sgt. K. Morris, at 30.

at the time. Apparently he no longer has the phone he used to and I can't get ahold of him. He will probably be our best bet. Now that you can't find it, I wonder if they ever completed the search warrant for the download of ███ phone.[37]

After some attempts to find current contact information, TFO Harris emailed Cpl. Morris:

I could really use your help tracking down some evidence for the OJ GREEN case. He was the supplier to ███████████ ████ which caused ████ to overdose. Give me a shout when you have a second if you can. I was directed to Sgt. Cooper but he is not having any lucking finding what we need as you will see in the email chain below.[38]

Harris and Morris apparently spoke by telephone, after which she emailed Sgt. Cooper on June 17, 2024:

I was able to make contact with Kyle on that second number provided. It sounds like you are correct and they may have done the download at a local agency. He is going to get me all the details needed pertaining to the search warrant and to fulfill the discovery.

Sgt. Cooper replied "Great! No problem. Sorry for all the confusion on MSP's side."[39]

One month later, on July 17, 2024, Sgt. Morris wrote to Sgt. Barth: "In regard to ████ ███████ cell phone. Charles County Sgt. Harris from their narcotics unit will be coming to take custody of the phone." Barth replied, "The cell phone was destroyed along with the other items."[40]

A week later, on July 25, TFO Harris wrote to Det. Sgt. Barth as follows:

I am writing in reference to case number ███-MSP-███████ and evidence pertaining to a search warrant on ███████ ███████, Waldorf, MD. This MSP case was adopted by the DEA in 2022 and is currently being prosecuted out of the US Attorney's Office in Greenbelt. This month, as we are gather all of the evidence together for discovery, I learned that the cell phone belonging to ████████████ which was held as evidence with MSP, was possibly destroyed. The AUSA on the case, Darren Garner, is requesting all documentation pertaining to the phone and

---

[37] *Id.* at 29.
[38] *Id.* at 10.
[39] *Id.* at 4.
[40] Ex. 7 at 5-6.

all other evidence for this case currently held with MSP, including evidence logs, and documentation of the destruction. He is also requesting official documentation be added to the casefile (and provided to the US Attorney's Office) as to how/why the phone was destroyed, whether intentional or unintentional. Could you please give me a call so that we can talk about this further and confirm the details of what evidence we do or do not still have with MSP. My contact numbers are listed below. I was the Task Force Officer (TFO) with the DEA at the time this case developed, and I have copied the current TFO managing the case on the DEA side as we move into trial posture.[41]

Det. Sgt. Barth replied that he would look into the matter when he returned to work on July 29th. Lt. Everett West II, the Barrack Commander, then emailed TFO Harris:

I have just learned the drugs in this case were also destroyed.

I have instructed D/Sgt. Barth to provide you with all relevant information and documentation surrounding the Chain of Custody and Destruction of all of the items related to this case. Please let me know if there is anything else I can do to be of assistance.[42]

Det. Sgt. Barth then emailed TFO Harris an attachment on July 29th, to which TFO Harris replied: "Thank you for the letter, and the property log. It was provided to the AUSA and will be added to the DEA casefile. He plans to have to testify to the event in some capacity."[43]

On information and belief, at no time during the approximately 22 months these items were in the possession of the government did anyone (1) create a forensic image of the LG TracFone or extract data from it; (2) photocopy or photograph the pages of the "drug ledger"; or (3) process the prescription bottles for latent fingerprints or DNA evidence. The government failed to take these actions—on items belonging to the principal cooperating witness against Mr. Green in this case—despite the obvious likelihood that doing so would lead to material evidence, exculpatory evidence,

---

[41] Exhibit 13, Email chain among TFO C. Harris, Det. Sgt. J. Barth, and Lt. E. West II, at 1.
[42] *Id.* at 4. As noted previously, it is logical to assume that the prescription bottles were destroyed along with their contents.
[43] *Id.* at 9.

or evidence undermining ███████ credibility. And despite the DEA having been involved with the investigation from the outset, the government failed to attempt to transfer these items into federal custody until it was too late.

### G. The government obtains a Superseding Indictment charging Mr. Green for drug distribution resulting in ██████ death.

On August 1, 2024, the government obtained a Superseding Indictment from a Grand Jury of this Court, charging Mr. Green with distributing fentanyl resulting in ██████ death. ECF No. 51 at 1. The Superseding Indictment also charged the January 21, 2022 and September 28, 2022 distributions alleged in the original Indictment, and added two additional alleged distributions on March 3, 2022 and May 17, 2022. *Id.* at 2.

### H. The government intends to use cell site location information—which is less accurate than the GPS data likely destroyed along with the LG TracFone—to place the LG TracFone in proximity to Mr. Green's cell phone at the time of the alleged drug distribution.

In at least two sworn affidavits, the government has asserted that historical cell site location information (CSLI) places ██████████ LG TracFone (-7754) in proximity to Mr. Green's known -9009 number, on February 7, 2022—the date of ██████████ death.[44] Notably, it is *not* alleged that ████████ contacted "Ice" on the -9009 number that day, or ever.[45] The government likely will seek to use this information at trial to corroborate ██████████ account of purchasing drugs from Mr. Green that day, which is the centerpiece of the government's theory connecting Mr. Green to the overdose death of ██████████

---

[44] Ex. 2 at 6; Ex. 8 at 8 (¶ 21).
[45] Ex. 2 at 6. As far as can be discerned, ████████ never claimed to know the -9009 phone number, and telephone records obtained by the government show no contact between Mr. Green's -9009 number and ████████ -7754 number.

The defense has retained Joshua Michel, a Senior Forensic Examiner at Roloff Digital Forensics. Mr. Michel's declaration is attached as Exhibit 14. Regarding the cell site location information,[46] Mr. Michel writes:

> I was asked to review data obtained by law enforcement in the case of U.S. v O.J. Green. This data included Call Detail Records (CDRs) for a Verizon Wireless user with the phone number ██████-7754. I was advised the user of this account was ████████████.
>
> The Verizon Wireless warrant return included call detail records for the timeframe of 1/16/22 to 2/15/22. This information includes not only the logged calls, their date/time and duration but also the cell site or "tower" that handled the call including the tower location. The towers and their antenna arrays are geographically fixed, providing signal coverage to the area surrounding and are divided into what are referred to as sectors. The most common tower configuration includes three sectors, each providing coverage to approximately 120 degrees for a full 360 degrees of surrounding coverage. The effective coverage distance of a single sector can extend as far as the nearest cell site and beyond. When a call occurs, it connects to one of these sectors, then due to the overlap in coverage areas, can maintain connection by switching between towers and sectors as the device moves beyond one effective coverage area to the next, this switching is referred to as a "hand off".
>
> No additional location-based information was provided for my review[47], such as round-trip time (RTT), which is not related to any calls and is a separately logged measurement providing an estimated distance from the tower the device is connected to. Nor was there any location information related to the device's data sessions, which are also separately logged from calls, both of which would assist in further fleshing out a more precise timeline of activity by providing additional context at each recorded point in these records and in the case of RTT, a more precise distance from the tower.[48]

With regard to the LG TracFone, Mr. Michel states:

---

[46] Cell site location information is derived using call detail records (CDRs) obtained from a carrier such as Verizon via a search warrant. Unlike GPS data (discussed below) it is not extracted directly from a cell phone.

[47] Defense counsel provided Mr. Michel all Verizon information for ████-7754 which was produced by the government.

[48] Ex. 14 at 3.

The International Mobile Equipment Identifier (IMEI) for this device was identified as "356058106116781". Based on this information, the device appears to be an LG Journey LTE smartphone device released in October 2019.

With a modern smartphone such as this, *additional location data, such as Global Positioning System (GPS) information could likely be obtained if an extraction of the device data was obtained.* When a GPS receiver is utilized, it records a longitude and latitude coordinate related to the associated activity. This data is derived from a connection to orbiting satellites as well as the cellular network and is more precise than location data obtained from the calls logged through cell sites contained in the CDRs. *While a standard urban cell site connection taken from a cellular service provider's call detail records are frequently estimated within distances of one mile or less (however, sometimes more), a typical GPS signal under optimal conditions, can be estimated within one to five meters.*[49]

(Emphasis added.)

By destroying the LG TracFone without making a forensic image, the government has foreclosed Mr. Green's ability to show with much greater accuracy the relative positions of █████ ████ LG TracFone and the -9009 cell phone on the day of ████████████ death.

## I.  Additional data on the destroyed LG TracFone was material to Mr. Green's defense and would likely contradict ███████████ account or be otherwise exculpatory to Mr. Green.

Mr. Michel goes on to state in his declaration that:

In addition to GPS data, typical data types such as *call logs, text messages, contact names, internet history, social media activity and email* may also be retrieved from a forensic extraction.

This information is commonly used to help place context to the device usage and user knowledge and/or activity as it may pertain to an investigation.[50]

(Emphasis added.)

---

[49] *Id.* at 3-4.
[50] *Id.* at 4.

Access to ███████████ call logs, text messages, contact names, internet history, social media activity and email would have been material to Mr. Green's defense because, without limitation, they would likely have contradicted ███████ account of events or been otherwise exculpatory to Mr. Green.

███████ alleged that he communicated with "Ice" on the ███████-4203 telephone number. Text detail records produced by the government show that ████████ ██████-7754 number exchanged text messages with the -4203 number on multiple occasions, but the records do not include the content of the text messages.[51] The LG TracFone very likely would contain the content of these text messages, which are plainly material to the defense because they would either support or refute the contention that the -4203 number belonged to Mr. Green or that the owner of the -4203 number arranged a drug distribution to ████████ on the day of ████████ death.

As noted above, by at least February 22, 2022 (when Verizon produced the second tranche of records for the -9009 telephone line), the government knew or should have known that there were particular reasons to doubt ████████ claim that the -4203 number belonged to "Ice," whom the government believed to be Mr. Green. These included the multiple calls and texts between the -4203 and -9009 numbers and the text sent from -4203 in which the sender refers to ██ self as "██████."

## II.    Argument

The Court should dismiss Count One. Due process required that the government preserve and produce all evidence which would tend to exculpate Mr. Green, as well as all evidence which would tend to impeach the credibility of ████████ a key witness for the prosecution. All of the evidence destroyed by the government in this case had exculpatory value that was

---

[51] For the government's reference, these are files "TextDetail-Historical_SMS___████7754_2022-01-16_to_2022-02-15.853" and "TextDetail-Historical_SMS___████4203_2021-07-13_to_2022-07-13.114processed.xlsx."

apparent at the time of its destruction, and Mr. Green is unable to obtain comparable evidence by reasonably available means. No bad faith requirement should apply in this case, but even if it does, the government acted in bad faith when it destroyed this evidence.

In the alternative, the Court should exclude the testimony of ███████ and the cell site location information from the LG TracFone's -7754 telephone line. The Court's Due Process Protections Act Order provides a separate and independent basis for dismissal or exclusion of evidence. Mr. Green is entitled to an evidentiary hearing on this Motion.

**A. The Court Should Dismiss Count One.**

**1. The Fifth Amendment Due Process Clause entitles a Defendant to "all evidence which tends to exculpate him of guilt," including evidence which "tends to impeach the credibility of a key witness for the prosecution."**

The Fifth Amendment's Due Process Clause mandates "the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 107 (1976). A central "principle of due process is that the defendant is entitled to [be] made aware of, and to use, all evidence which tends to exculpate him of guilt of the charges against him." *United States v. Elliott*, 83 F. Supp. 2d 637, 641 (E.D. Va. 1999), citing *Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *United States v. Bagley*, 473 U.S. 667, 674 (1985); *Agurs*, 427 U.S. at 106; *Brady v. Maryland*, 373 U.S. 83, 86 (1963). Importantly, "evidence is favorable not only when it tends substantially to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution." *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018).

2. **Government spoliation of evidence is a due process violation where the evidence had an apparent exculpatory value at the time of destruction and the defendant would be unable to obtain comparable evidence by reasonably available means. If the content of the evidence is unknown, an additional requirement of bad faith may apply.**

"Spoliation of evidence, or the destruction of or failure to preserve evidence, can be a due-process violation." *United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024), citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

A due process violation is established where a defendant shows, first, that the "that the unpreserved evidence had 'an exculpatory value that was apparent before the evidence was destroyed[ ] and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means,'" *Perry*, 92 F.4th at 513, quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984); and second, that the police acted in bad faith in failing to preserve the evidence. *Perry*, 92 F.4th at 513 citing *Youngblood*, 488 U.S. at 58. Thus, for a spoliation of evidence to violate due process, "'the police themselves by their conduct [must] indicate that the evidence could form a basis for exonerating the defendant' yet still fail[] to preserve it." *Perry*, 92 F.4th at 513 citing *Youngblood*, 488 U.S. at 58.

Said another way:

> The suppression of material exculpatory evidence violates the right to due process, "irrespective of the good faith or bad faith of the prosecution." *See Brady*, 373 U.S. at 87 . . . . A showing of bad faith is required, however, when the lost evidence can only be said to be "potentially useful" to the defendant because the contents of the evidence are unknown. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

*United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021).

The *Youngblood* bad faith requirement may be subject to reasonable limits. At least one court in this Circuit has found that:

> Based on this scrutiny of the facts and language in *Youngblood*, the court is persuaded that the Supreme Court did not intend for the *Youngblood* [bad faith] caveat to apply to every instance where State officials intentionally destroy evidence that is material to a defendant's guilt or innocence. In a case where State officials intentionally destroy evidence that is absolutely crucial and determinative to a prosecution's outcome, the court holds that the *Youngblood* caveat does not apply.

*United States v. Belcher*, 762 F. Supp. 666, 672-73 (W.D. Va. 1991) (dismissing indictment with prejudice under *Trombetta* standard where the government destroyed alleged marijuana plants which the defendant was charged with possessing.)

3. **The destroyed items had exculpatory value that was apparent at the time of their destruction and Mr. Green is unable to obtain comparable evidence by reasonably available means.**

At the time of their destruction, the LG TracFone, "drug ledger," and prescription bottles had the apparent potential to exculpate Mr. Green for at least the following reasons.

As an initial matter, the government fully understood at the time of these items' destruction that they had been seized from ████████ and that it intended to charge Mr. Green in connection with ████████ overdose death on the theory that the drugs in question had flowed from Mr. Green to ████████ to ████████ Also as discussed above, from the beginning this investigation was a joint effort by MSP, CCSO, and the DEA through its TFOs at those agencies.

GPS Data from the LG TracFone

As Mr. Michel's affidavit explains, had the LG TracFone been preserved, "additional location data, such as Global Positioning System (GPS) information could likely be obtained," which is typically substantially more accurate than cell site location information—on the order of "one to five meters" under optimal conditions, rather than "a mile or less."[52] The government intends to use cell site data from the LG TracFone to establish its proximity to Mr. Green's -9009

---

[52] Ex. 14 at 3-4.

cell phone on the day of ███████████ death, in support of its theory that Mr. Green supplied ███████████ with drugs that day. Being able to show the relative positions of these devices to an accuracy of meters rather than up to a mile would have had the obvious potential to exculpate Mr. Green by showing, for example, that during a period the phones were within 1 mile of each other based on cell site data, they were never actually closer than 0.9 miles apart based on GPS data. Destroying the LG TracFone foreclosed Mr. Green's opportunity to make this showing, because its GPS data was stored within the phone and thus not available from any other source.

<u>Text Message Content and Other Data from the LG TracFone</u>

As Mr. Michel's affidavit further explains, had the LG TracFone been preserved, "typical data types such as call logs, text messages, contact names, internet history, social media activity and email may also be retrieved from a forensic extraction."[53] Such data had exculpatory potential for several reasons, all of which should have been apparent to the government.

First, ███████████ claimed the -4203 telephone number saved in his contacts as "█" (actually "███████████") belonged to "Ice," and that ███████████ arranged drug transactions with "Ice" at that number. Access to the content of ███████████ texts with the -4203 number could have refuted these claims about the subject matter of those texts. Because carrier records for ██ ███████████ -7754 line included only the times but not the content of his texts with -4203, the data stored on the LG TracFone would have been Mr. Green's only source for this information.

Moreover, well before it destroyed the LG TracFone, the government was in possession of records which called into doubt, if not disproved, ███████████ claim that -4203 belonged to "Ice," if "Ice" was indeed Mr. Green. (Beyond, of course, the fact that ███████████ had saved this number as "███████████"—a designation with no obvious reference to either "Ice" or any part of Mr.

---

[53] *Id.* at 4.

Green's name.) As discussed above, records from Mr. Green's -9009 telephone line revealed that the frequency and content of contacts between the -9009 and -4203 numbers strongly suggested that -4203 belonged to a person known to Mr. Green, rather than to Mr. Green himself. Once again, access to the *content* of ███████ texts with the -4203 number was therefore likely to have provided additional evidence that ███████ was lying or mistaken when he claimed that -4203 belonged to "Ice." Notably, the government showed enough interest in this contact to look at ███ ███████ phone and take pictures of it on the screen, but declined to look at the text messages exchanged with that number.

By destroying the LG TracFone, the government foreclosed Mr. Green's ability both to show that he was not a party to ███████ texts to -4203 and/or that such texts were not drug-related, and to impeach ███████ credibility more generally with this untruthfulness. *See Abdallah*, 911 F.3d at 217 ("evidence is favorable . . . when it tends to impeach the credibility of a key witness for the prosecution.")

Second, the government's theory of Mr. Green's guilt depends on the premise that any drugs ███████ obtained from ███████ must have come from Mr. Green. In his interview, ███████ claimed that "Ice" was the only source of supply for drugs found during the search of his house.[54] The content of ███████ text messages, as well as his call logs, contacts, internet history, social media activity, and email, would have been highly probative of this claim that he had no other sources of supply. Identification of an alternative source for the drugs which allegedly produced the fatal overdose would be exculpatory for obvious reasons, as would the ability to impeach ███████ credibility with this additional false statement.

---

[54] As noted above, he also insisted that the drugs ███████ had used at his house could not have been the cause of ███████ death. He explained the reasons for that belief, including identifying the individuals from whom he believed it was likely ███████ obtained additional drugs later in the day.

Third, from the outset of this investigation it was apparent that ████ would be the government's "star witness" in any prosecution of his alleged supplier for the death of ████, since the entire theory depends on the drugs flowing from the supplier to ████ and from ████ to ████ Any information revealing a motive to fabricate or a character for dishonesty would be exculpatory because it would permit impeachment of this crucial government witness.[55] *Abdallah*, 911 F.3d at 217. Because cell phones are "a digital record of nearly every aspect of [their owners'] lives," *Riley v. California*, 573 U.S. 373, 395 (2014), it was apparent to the government that destroying the LG TracFone would foreclose Mr. Green's ability to access this trove of potentially impeaching information.

All of the data stored within the LG TracFone was destroyed when the device was destroyed, and Mr. Green is therefore unable to obtain it from any other source.

<u>"Drug Ledger"</u>

The content of the "drug ledger" had the obvious potential to exonerate Mr. Green because it might have contained records of ████ purchasing drugs from other individuals in the period leading up to ████ death. Once again, identification of an alternative source for the drugs which allegedly produced the fatal overdose would be highly exculpatory, as would the ability to impeach ████ credibility in general with this additional false statement. Destroying the "drug ledger" foreclosed Mr. Green's ability to access this potentially exculpatory information. No copies of the "drug ledger's" pages have been produced to the defense, and on information and belief none were made. As such, Mr. Green is unable to obtain this information from any other source.

---

[55] Indeed, anyone involved in the investigation of "death resulting" drug distributions would understand that someone in ████ position has a motive to fabricate incriminating evidence against his alleged source of supply: to "work off" the charges or at least reduce his own sentencing exposure.

<u>Prescription Bottles</u>

████████ statements that "Ice" would rip the labels off prescription bottles by hand and had done so as recently as "the day before yesterday" (i.e., two days before the bottles were seized) made it apparent to the government that the absence of Mr. Green's fingerprints and DNA, or the presence of another person's fingerprints or DNA, would be exculpatory. Destroying the prescription bottles foreclosed Mr. Green's ability to test them for latent fingerprints or DNA, and thus of access to this potentially exculpatory information. On information and belief, no government fingerprint or DNA tests of the prescription bottles were performed. As such, Mr. Green is unable to obtain this evidence from any other source.

        **4.**      **No bad faith requirement should apply, but even if it does, the government acted in bad faith when it destroyed this evidence.**

As the Fourth Circuit explained in *Johnson*, the requirement of a bad-faith showing to establish a due process violation turns on whether the lost evidence "can only be said to be 'potentially useful' to the defendant because the contents of the evidence are unknown." *Johnson*, 996 F.3d at 206, citing *Youngblood*, 488 U.S. at 57-58. At least with respect to the destroyed text messages with the -4203 number, the content is *not* entirely unknown—call logs and other text messages from that number have been preserved and strongly suggest (in addition to its entry in ████████ contents as "████████") that it does not belong to Mr. Green. Thus, there is substantial reason to believe that the content of ████████ texts with the -4203 number would have further exculpated Mr. Green on this point. For this reason, no bad faith requirement should apply to the destruction of the LG TracFone.

As suggested in *Belcher*, the *Youngblood* bad faith standard should not apply where the destroyed evidence is "absolutely crucial and determinative to a prosecution's outcome." 762 F. Supp. at 672. Because all of the destroyed evidence at issue here would have gone directly to the

truth or falsity of the central government witness's testimony—the linchpin of the case connecting Mr. Green to the drugs which allegedly caused ███████ death—it meets this standard and should not be subject to the bad faith requirement.

In addition, the government's intention to use cell site location data generated by the LG TracFone after it destroyed that device—and with it, Mr. Green's ability to rebut that evidence using more accurate GPS data—is particularly analogous to *Belcher*. *See id.* at 672 (government sought to introduce officer testimony that plants were marijuana but had destroyed the plants, thus foreclosing defendant's ability to rebut this assertion through testing.)

However, even if the *Youngblood* bad faith standard applies to some or all of the evidence destroyed in this case, that standard is met. First, and as noted above, from the beginning this investigation was a joint effort by MSP, CCSO, and the DEA through its TFOs at those agencies. The government fully understood at the time of these items' destruction that these items had been seized from ███████ and that it intended to charge Mr. Green in connection with ███████ overdose death on the theory that the drugs in question had flowed from Mr. Green to ███████ to ███████

Second, the communications within MSP reveal that Sgt. Barth, the individual who destroyed the LG TracFone and "drug ledger" and sent the prescription bottles for destruction, was directly on notice that ███████ would be testifying against a suspect in a federal fatal overdose case. Sgt. Lane communicated to Sgt. Barth both that "a suspect involved in this fatal overdose will be indicted federally" and that "the federal suspect who is awaiting trial is the one who sold these items to ███████ and ███████ has agreed to testify against this party."

Later, Sgt. Barth was informed by Cpl. Morris that "the evidence can be destroyed *following the outcome of the case*, which I'm hopeful will be in the next few weeks. I will let you

know as soon as the court proceedings are done." (Emphasis added.) Yet when Sgt. Barth did not hear back after "checking in" some months later in December 2023, he went forward with the destruction without ever verifying whether the court proceedings were completed. In fact, the court proceedings were far from "done"; Mr. Green had already been under indictment for the controlled distributions for nearly a year at that point, and the superseding indictment charging ███████ death was returned eight months later.

Third, Cpl. Morris's communications to Sgt. Barth also give cause for concern. He participated in the original interview of ████████ and so was fully aware of ████████ role in the case, of his claims about using the LG TracFone to arrange drug transactions with "Ice," and of his account of "Ice" handling the prescription bottles. Cpl. Morris appears to have been knowledgeable about the federal prosecution: "[t]his case is wrapping up in federal court. We just enter the last bit of evidence requested by the defense." But then, at a time (October 2023) when there was no obvious reason to think this, he told Sgt. Barth "the evidence can be destroyed following the outcome of the case, which I'm hopeful will be in the next few weeks. I will let you know as soon as the court proceedings are done." And despite having given this conditional authorization to destroy the evidence, he failed to respond to Sgt. Barth's December 4, 2023 email—when he should have let Sgt. Barth know that the case was still very much active.

Finally, the government's actions taken in total reflect a willful blindness to the likelihood that the destroyed items contained exculpatory evidence. In particular, the government interviewed ████████ on at least two occasions, took photographs of the phone numbers that it wanted from his cell phone contacts, accepted his assertions about who those numbers belonged to, relied on his statements in obtaining cell site location information that would bolster his story, and planned to (and later did) indict Mr. Green based on his Grand Jury testimony. Yet it failed entirely to take

obvious steps that would have corroborated or disproved much of what ███████ was saying, and destroyed the evidence that would have allowed Mr. Green's defense team to do so.

For all of these reasons, if the *Youngblood* bad faith standard applies to some or all of these evidence destructions, it is satisfied here. At the very least, as discussed below, Mr. Green is entitled to an evidentiary hearing to develop evidence on this point.

### 5. The Court's Due Process Protections Act Order provides a separate and independent basis for dismissal.

The Court's Due Process Protections Act Order (ECF No. 9, Jan. 4, 2023) provides a separate and independent basis for dismissal. The Order compelled the government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and informed the government that the sanctions for failure to do so could include "dismissal of charges." In particular, the Order stated that "*Brady v. Maryland* instructs that 'the suppression by the prosecution of evidence favorable to an accused' violates due process where the evidence is 'material either to guilt or punishment, *irrespective of the good faith or bad faith of the prosecution*.' 373 U.S. at 87." (Emphasis added.) The government's destruction of evidence 11 months later (in December 2023) violated the Court's order whether or not it was done in bad faith, and the government was on notice that a possible sanction for that violation was dismissal.

### B. In the alternative, the Court should exclude the testimony of ███████ and the cell site location information from the LG TracFone's -7754 telephone line.

Dismissal of Count One is the appropriate remedy for the destruction of this evidence. If the Court disagrees, however, it has the alternative option of excluding evidence—a staple remedy for discovery violations. *See* Fed. R. Crim. P. 5(f); Fed. R. Crim. P. 16(d)(2); *United States v. Young*, 248 F.3d 260, 270 (4th Cir. 2011) (excluding audio recording for non-disclosure under Rule 16); *United States v. Liberto*, No. RDB-19-0600, 2021 WL 4459219 (D. Md. Sept. 29, 2021)

(excluding witness and documents related to his testimony due to late disclosure of exculpatory material related to his expected testimony.)

This remedy is also available for the separate and independent reason that the Court's Due Process Protections Act Order, discussed above, compelled the government to comply with its *Brady* obligations and informed the government that the sanctions for failure to do so could include "exclusion of evidence." ECF No. 9.

Here, two specific exclusions are called for. First, ▓▓▓▓▓ should be excluded from testifying. As detailed above, multiple, crucial aspects of ▓▓▓▓▓ account would have been potentially rebuttable but for the destruction of the LG TracFone, "drug ledger," and prescription bottles. These include:

- That "Ice" was the user of the -4203 number saved in ▓▓▓▓▓ contacts;
- That ▓▓▓▓▓ communications with the -4203 number were for the purpose of arranging drug transactions;
- That he had no other suppliers except "Ice";
- That the prescription pill bottles found in ▓▓▓▓▓ house came from "Ice."

Of equal importance, ▓▓▓▓▓ is the central government witness in the case, and Mr. Green has been deprived of numerous potential sources of material which could impeach his credibility. *See Abdallah*, 911 F.3d at 217.

Second, the cell site location information from the -7754 telephone line associated with the LG TracFone should be excluded. Permitting the government to establish the LG TracFone's proximity to Mr. Green's phone using the less-accurate method of cell site location would offend due process and be fundamentally unfair where the government's destruction of evidence has foreclosed Mr. Green's ability to rebut that evidence using the more accurate method of GPS data.

### C. Mr. Green is entitled to an evidentiary hearing.

The exhibits to this Motion provide sufficient evidence for the Court to grant it on the pleadings. However, at the very least the Court should hold an evidentiary hearing to further develop the record. In *United States v. Johnson*, 996 F.3d 200, 206-16 (4th Cir. 2021) appellants Johnson and Stewart were charged with heroin distribution resulting in death. Other evidence in the case suggested that the victim had used drugs from another source on the day of his death, and that additional such evidence would be located on the victim's cell phone. When the defense requested the victim's cell phone, the government acknowledged that it had returned the device to the victim's parents without making a forensic image, and that the parents had since lost the phone. Johnson and Stewart sought dismissal of the resulting-in-death count, citing inter alia *Youngblood*, *Trombetta, Brady,* and *Agurs*. The district court denied their motion without permitting an evidentiary hearing, which they had requested in order to examine law enforcement personnel on the issue of whether they acted in bad faith by failing to preserve the phone's contents. *Id*. at 212. Johnson and Stewart were subsequently convicted.

On appeal, the Fourth Circuit reversed and remanded, finding that the district court had "erred by rejecting the defendants' claim in reliance on an incomplete record," and that it could not "ratify the district court's approach of disallowing witnesses and then relying on the limited evidentiary record to reject the defendants' claim." *Id.* at 215-16.

### III.    Conclusion

For all of the foregoing reasons, the Court should dismiss Count One of the Superseding Indictment (ECF No. 51).

A proposed order is attached.

Respectfully submitted,


James Wyda
Federal Public Defender

_____/s/_____
Douglas R. Miller, #18309
Ellie C. Marranzini, #817525
Assistant Federal Public Defenders
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: douglas_miller@fd.org
        ellie_marranzini@fd.org